# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DEAN FOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00691 |
| | ) | Judge Aleta A. Trauger |
| REPRESENTATIVE JEREMY | ) | |
| FAISON, in his official capacity as | ) | |
| State Representative, representing the | ) | |
| 11th District of the Tennessee House | ) | |
| of Representatives, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM

Plaintiff Dean Fox has filed a Motion for Preliminary Injunction (Doc. No. 6), to which Representative Jeremy Faison has filed a Response (Doc. No. 12), and Fox has filed a Reply (Doc. No. 16). Faison has filed a Motion to Dismiss (Doc. No. 17), to which Fox has filed a Response (Doc. No. 23), and Faison has filed a Reply (Doc. No. 24). For the reasons set out herein, Fox's motion will be denied, and Faison's motion will be granted in part and denied in part.

## I. BACKGROUND

Representative Jeremy Faison represents the 11th District in the Tennessee House of Representatives. Faison, like many elected officials, has a social media presence, which he uses to communicate with the public regarding issues that he has deemed to be significant. That social media presence includes a Facebook "page" that describes itself as belonging to "State Representative Jeremy Faison." Although "page," in its informal usage, could theoretically be

used to refer to any web location accessible by browser, that designation has a narrower meaning on Facebook. Facebook distinguishes between three types of Facebook-based sites: profiles, groups, and pages. As Facebook describes it, "[a] profile is a place on Facebook where you can share information about yourself, such as your interests, photos, videos, current city and hometown." (Doc. No. 12-2 at 2.) A "group" is "a place to communicate about shared interests with certain people" whom the administrator "want[s] to be able to join and see the group." (*Id.* at 3.) A "page," in contrast, is neither the online home of a single private individual nor a meeting place devoted broadly to a topic or community. As Facebook puts it, "[p]ages are places on Facebook where artists, public figures, businesses, brands, organizations and nonprofits can connect with their fans or customers." (*Id.* at 2.)

Faison has confirmed that he created the "State Representative Jeremy Faison" page and is its administrator. Regarding the page's content and purpose, he states:

> The posts I publish on my page cover a range of topics. Some of my posts relate to my family and personal interests, some relate to my personal opinions, some relate to campaign efforts, and others relate to legislative initiatives and efforts. . . . I used the page for campaign purposes in 2016, 2018, and 2020. I have been using my page for reelection purposes for my current 2022 election. . . .

> The purpose of my page never was to create a forum allowing any Facebook user to post anything they want on my page. The purpose of the page has always been limited to promoting my reelection campaigns, sharing my personal thoughts and opinions on various topics, and disseminating information concerning the limited topics I choose to post about. Based on the authority given to me by Facebook's terms of service, I reserve the right to hide or delete comments from my page and block accounts from further engaging with it.

(Doc. No. 12-1 ¶¶ 16, 18, 29.) Faison admits that "some of [his legislative] staff members" have the ability to post on and otherwise manage the page as administrators, but they have never done so. Some paid campaign consultants, however, have posted to the page on Faison's behalf. (*Id.* ¶ 19.)

2

Dean Fox is an adjunct professor at Middle Tennessee State University and a freelance sports journalist who currently lives in Knox County, although he lived in Rutherford County when the events giving rise to this case occurred. (Doc. No. 1-1 ¶¶ 2–3.) Although Fox is not directly represented by Faison—because he does not and did not, at any time relevant to this case, live in the 11th District—Fox has a general interest in Tennessee politics, which has led him to monitor and, in a number of instances, comment on Faison's posts. On September 6, 2021, Faison made one such post—in this instance, commemorating Labor Day. According to Faison, this post was authored and posted by two campaign consultants, Lauren Hathaway and Lexi Brammer. (Doc. No. 12-1 ¶ 20.) An argument broke out in the post's comment section, and Faison participated both through his personal "profile" account and as "State Representative Jeremy Faison." The details of the argument are mostly beside the point, but, generally speaking, the dispute was between commenters who complained about the economic circumstances facing workers and Faison, who responded that those users' complaints were "very un American" because "[t]here is always a way [to succeed] if you are willing to work hard enough."[1] (Doc. No. 1 ¶¶ 38–40; Doc. No. 1-1 ¶ 7.) Fox read the exchange and decided to join in. He posted a comment arguing that Faison's position was hypocritical in light of the fact that, according to Fox, Faison had been the beneficiary of a $25,000 loan forgiven under the federal government's Paycheck Protection Program. (Doc. No. 1-1 ¶ 8.)

Faison deleted Fox's comment. Fox posted another comment, complaining about the deletion. Faison deleted that comment and blocked Fox from the "State Representative Jeremy Faison" page. (*Id.* ¶ 10.) Faison has confirmed, in connection with this litigation, that he personally deleted Fox's comments and made the decision to block Fox, after determining that

---

[1] All spelling is unaltered.

Fox was not a direct constituent. (Doc. No. 12-1 ¶ 27.) Faison states that, prior to the Labor Day post, Fox had commented on Faison's posts "for about a year," often posting comments that were sharply critical of Faison. (*Id.* ¶ 28; *see* Doc. Nos. 12-13 to -16.)

As of the time of this writing, Fox remains blocked, meaning that, while signed into Facebook as himself, he cannot (1) view the content on the "State Representative Jeremy Faison" page; (2) comment on any posts made by Faison on the "State Representative Jeremy Faison" page; or (3) see what anyone else posted as a comment on the "State Representative Jeremy Faison" page. Fox states that, if he were not blocked, he would continue to view and comment on the page's posts. (Doc. No. 1-1 ¶ 11–12.) During oral argument, counsel for Fox conceded that Fox can see the content of the page by accessing it when he is not actively signed into Facebook under his own Facebook account.

On September 6, 2022, Fox filed a Complaint (Doc. No. 1) stating two counts against Faison in his official capacity. Count I is a claim pursuant to 42 U.S.C. § 1983 based on the violation of Fox's rights under the First Amendment to the U.S. Constitution. (*Id.* ¶¶ 5, 54–62.) Count II is a claim pursuant to Tenn. Code Ann. § 1-3-121 based on the violation of Fox's rights under Article 1, section 19 of the Tennessee Constitution. (*Id.* ¶¶ 5, 63–71.) Fox seeks a "declaration that [Faison's] policies and practices of blocking Mr. Fox from Defendant's Facebook page violate the First Amendment of the Constitution and Article 1, Section 19 of the Tennessee Constitution" and an "injunction ordering Defendant to unblock Mr. Fox from the 'State Representative Jeremy Faison' official Facebook page, to cease deleting comments protected by the First Amendment on his official State Representative social media accounts, and to refrain from blocking individuals based on viewpoint, including on his 'State Representative Jeremy Faison' official Facebook page." (*Id.* at 21.)

On September 15, 2022, Fox filed a Motion for Preliminary Injunction (Doc. No. 6), asking the court to forbid Faison from "unconstitutionally deleting Plaintiff's comments and blocking Plaintiff from viewing and commenting on the 'State Representative Jeremy Faison' Facebook page or other official State Representative social media accounts." (*Id.* at 4.) On October 18, 2022, Faison filed a Response (Doc. No. 12). Faison argues that Fox has no likelihood of success on the merits because the page at issue either was nongovernmental and therefore outside of the scope of the First Amendment or, in the alternative, was a form of "government speech" over which Faison had the right to exercise control, including by selecting which comments to permit.

On November 21, 2022, Faison filed a Motion to Dismiss (Doc. No. 17). In addition to the arguments raised in connection with the Motion for Preliminary Injunction, Faison argues that Fox's state-law claim is barred by sovereign immunity and that both of Fox's claims are barred by Faison's legislative immunity. The court held a hearing on the pending motions on March 24, 2023. The parties presented arguments, but they did not (and did not request to) present additional evidence beyond the written materials that they had provided in connection with the motions.

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp.

5

2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

## B. Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that

6

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. Relationship Between the Pending Motions

A number of the issues that the parties have raised are relevant to both pending motions. The facts available to the court for consideration, however, differ depending on the motion under consideration. A Rule 12(b)(6) motion to dismiss solely tests the adequacy of the plaintiff's complaint—not the amount of support for the allegations therein. Accordingly, the court treats all of the plausible assertions in the challenged complaint as entirely true. In contrast, "[e]vidence that goes beyond the unverified allegations of the pleadings . . . must be presented to support or oppose a motion for a preliminary injunction." *King v. Whitmer*, 505 F. Supp. 3d 720, 727 (E.D. Mich. 2020) (quoting Wright & Miller, 11A Fed. Prac. & Proc. § 2949 (3d ed.)).

In the abstract, an allegation can be "verified" in many ways, but the term, as used in the Federal Rules, typically refers to the practice of augmenting a pleading with an additional signed statement indicating that the assertions therein have been made under penalty of perjury. *See* 28 U.S.C. § 1746; Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1339 (4th ed.). Rule 11 of the Federal Rules of Civil Procedure provides that, "[u]nless a rule or statute specifically states otherwise, a pleading need not be verified . . . ." Fed. R. Civ. P. 11(a). Fox was therefore within his rights not to verify his Complaint. Nevertheless, because he did not do so, the allegations in the Complaint "are not evidence." *Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 284 n.14 (D.C. Cir. 2014) (citation omitted).

7

That does not mean that the contents of the Complaint are irrelevant to Fox's motion. The Complaint still tells the court what has been alleged, and the court can consider the existence of those allegations *as allegations* when considering the broad question of how likely Fox is to succeed on the merits. Moreover, insofar as Faison has conceded any of those allegations, either expressly or implicitly, the court can consider those admissions. Counsel for Faison discussed Fox's allegations at length during oral argument and did not dispute the basic facts. The court construes that as enough to treat at least those foundational details as uncontested. Moreover, Fox has supported some of those facts with a brief affidavit. The lack of more extensive sworn testimonial support for the rest of the Complaint, however, means that any allegations that appear solely in the Complaint carry significantly less weight than they otherwise might.

The court, accordingly, will take a two-step approach to the substantive issues that have been raised. First, the court will consider whether Fox has established a meaningful likelihood of success on the merits with regard to the issue at hand. That analysis will require the court to consider both the substance of the claim as pleaded and the extent to which Fox has supported his position with evidence. If the court concludes that Fox has established a significant likelihood of success on the merits with regard to an issue, that will typically mean that he has also established that the issue should be decided in his favor in connection with Faison's Motion to Dismiss; after all, one cannot be likely to succeed with regard to an allegation that has not even been pleaded sufficiently. However, if the court concludes that Fox has failed to establish a significant likelihood of success on the merits with regard to a particular issue, the court will take the further step of determining whether Fox's unproven allegations are nevertheless sufficient to avoid dismissal and permit the case to proceed to discovery—which might result in information

8

being uncovered or identified that would support success on the merits at a later stage in this case.

## B. State Action/Public Forum

"Under long-established First Amendment law, governmental entities are 'strictly limited' in their ability to regulate private speech in public fora." *Davison v. Randall*, 912 F.3d 666, 681 (4th Cir. 2019) (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009)). Those limitations extend not only to obvious, conventional public fora like public assemblies, *see, e.g., Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992), but also to less conventional government settings that, although they might not inherently be thought of as places for the public to express its views, have come to function as such through their actual use. Depending on the details of the situation, such settings are typically referred to as "designated" or "limited" public fora.[2] In a designated or limited public forum, the government can impose reasonable restrictions—including viewpoint-neutral regulations on content—but it cannot favor one competing viewpoint over another. *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019).

A government-controlled webpage with an active comment section open to the public would, generally speaking, meet the ordinary definition of a designated public forum. Accordingly, if the "State Representative Jeremy Faison" page was, in fact, such a site, then excluding Fox based on his criticism of Faison would likely have violated the Free Speech Clause of the First Amendment. Faison, moreover, does not dispute, at this stage, that Fox has produced evidence to support the inference that Faison blocked him based on his critical

---

[2] A designated public forum is government-controlled "property that has not traditionally been regarded as a public forum" but has been "intentionally opened up for that purpose," whereas a "limited public forum" "exists where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (citations omitted).

viewpoint. *See Price v. City of N.Y.*, No. 15 CIV. 5871 (KPF), 2018 WL 3117507, at *16 (S.D.N.Y. June 25, 2018) (observing that a government social media account's blocking of a user immediately after her criticism of public officials "strongly suggest[ed]" that the user was blocked "to prevent her from publicly criticizing [those] officials in those forums").

Faison argues, however, that the designated public forum analysis should not apply to this case, because Fox's argument is based on a faulty assumption: that the "State Representative Jeremy Faison" page was a government website in the first place. Faison is a public officeholder, but he is also an ordinary person entitled to the free exercise of his own First Amendment rights, including the right to comment on issues of public import and the right to campaign for election—and reelection—to office. Faison's First Amendment rights, moreover, unambiguously include a right not to be forced to amplify views with which he disagrees. "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Deleting unwanted content from a website that one controls is a form of exercising the right not to speak, consistently with the "cardinal constitutional command" that no government actor may "[c]ompel[ an] individual[] to mouth support for views [he finds] objectionable," unless justified by the strongest of rationales. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). Fox, of course, disputes Faison's contention that he operated the page in his private, nongovernmental capacity. That does not change the fact, however, that if Faison *is* acting in his private capacity when he operates the page, then his own First Amendment rights are very much at stake in this litigation.

The supposedly private nature of the page is relevant not only to the constitutional issue of whether Faison violated the First Amendment, but also to the statutory issue of whether Fox

has a cause of action under § 1983. In order to hold a person liable under § 1983, the plaintiff must show that his conduct is fairly attributable to the state—that is, that the conduct is or was "state action." *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). To determine whether a private actor's conduct constitutes state action, there must be "a sufficiently close nexus" between the actor's conduct and the state to warrant attribution of that conduct to the state. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974).

A number of circuits have considered these issues in the context of officials' social media profiles, including the Sixth. See *Lindke v. Freed*, 37 F.4th 1199, 1207 (6th Cir. 2022) (affirming judgment in favor of city manager who had blocked individual from the city manager's Facebook page and deleted that individual's comments); *Campbell v. Reisch*, 986 F.3d 822, 827 (8th Cir. 2021) (reversing judgment to plaintiff blocked from state representative's Twitter account); *Charudattan v. Darnell*, 834 F. App'x 477, 481 (11th Cir. 2020) (affirming summary judgment to defendant Sheriff based on blocking and deletion of comments from two Facebook pages); *Davison*, 912 F.3d at 688 (affirming judgment in favor of plaintiff who was blocked from the Facebook page of chair of county board of supervisors); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (affirming judgment in favor of plaintiffs who were blocked from the Facebook page of U.S. President; ultimately dismissed as moot after change in officeholder), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021).

Fox argues that the court should follow the lead of the Second and Fourth Circuits and find that a public official's social media profile, through which he communicates with the public on issues related to his job duties, is a public forum and that the official's actions taken limiting access to the page are state actions. *See Davison*, 912 F.3d at 681, 688; *Knight First Amend.*

*Inst.*, 928 F.3d at 236. Fox argues that Faison, like those defendants, uses his social media page "as a tool of governance," including through "back and forth constituent conversations." *Davison*, 912 F.3d at 680–81. (*See* Doc. No. 6-1 at 24 (example of constituent service).) Fox argues that "the content posted ha[d] a strong tendency toward matters related to [Faison's] office," *Davison*, 912 F.3d at 680–81 (internal quotation omitted), because the posts often involved either specific legislative matters or general topics of state government regulation—as the Labor Day-related post arguably did. Fox points out that the Sixth Circuit has acknowledged that a legislator's "duties" broadly include "communicat[ing] with their constituents and publicly discuss[ing] political matters." *Does 1-10 v. Haaland*, 973 F.3d 591, 602 n.4 (6th Cir. 2020). Moreover, it is widely understood that a legislator's ordinary duties commonly include the performance of "constituent service" of the type Fox has identified. *United States v. Mardis*, 670 F. Supp. 2d 696, 704 (W.D. Tenn. 2009), *aff'd*, 600 F.3d 693 (6th Cir. 2010).

Fox argues that a finding of state action is also supported by the fact that Faison's power to use his Facebook page in the manner that he does was "made possible only because [he] is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Admittedly, Faison, like anyone else, could create a Facebook account for himself without any government support. The "State Representative Jeremey Faison" page, however, (1) uses his official title, (2) is verified and identified by Facebook as the page of a "politician"; (3) attracts users, at least in part, due to Faison's public office; (4) is only able to serve as an avenue for constituent service due to Faison's public office; and (5) is in a form—a "page" rather than a "profile"—that Facebook only makes available to public figures. While there is no evidence that Facebook would refuse to designate Faison as a "politician" or "public figure" if he were merely a candidate, that is not, as a matter of actual

12

fact, all that he is or was when he created the page. His actual, existing status as a public figure was, at all times relevant to this case, related to his role as an actual officeholder.

Such arguments, however, are only viable insofar as they can be reconciled with the only one of the aforementioned social media-related cases that actually binds this court, the Sixth Circuit's *Lindke v. Freed* decision. *Lindke* was decided after a number of federal circuit courts had already had the chance to consider similar matters, and the Sixth Circuit made a specific point of acknowledging that it was rejecting the approach that "several other courts have used." *Lindke*, 37 F.4th at 1205–06 (citing *Knight*, 928 F.3d at 234–36 (2d Cir. 2019; *Davison*, 912 F.3d at 680–81; *Campbell*, 986 F.3d at 826–27 (8th Cir. 2021); *Charudattan*, 834 F. App'x at 482). The Sixth Circuit faulted those other courts' approach for focusing excessively on the "trappings" of officialdom, as displayed through the "page's purpose and appearance," at the expense of a "focus on the actor's official duties and use of government resources or state employees." *Id.* at 1206. This court's analysis, therefore, must start with *Lindke*—both in its holding and its admonition not to be overly swayed by the factors that other courts have, in the view of the Sixth Circuit, overemphasized.

*Lindke,* like this case, involved a Facebook "public figure" page operated by a public servant—the city manager of Port Huron, Michigan, James Freed. *Lindke*, 37 F.4th at 1201. Freed's page described him as the "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the citizens of Port Huron, MI," and it listed an email address that an individual could use to contact "City Administration and Staff" with particular concerns. *Id.* The page featured some posts that might strike a user as personal in character—such as photos of a family birthday party—as well as posts touching on issues directly relevant to Freed's governmental responsibilities, such as "administrative directives he issued" and information

13

involving the city's public health measures related to COVID-19. *Id.* at 1201–02. A "disconcerted citizen" began commenting negatively on Freed's page, and Freed, like Faison, deleted the comments and banned the user. *Id.* The citizen sued Freed pursuant to § 1983, and the district court ultimately granted summary judgment to Freed, which the Sixth Circuit affirmed. *Id.* at 1202, 1207.

The Sixth Circuit began its analysis of the state action issue by noting that the "caselaw is murky as to when a state official acts personally and when he acts officially," particularly in "the ever-changing world of social media." *Id.* at 1202. The court then explained that there are, broadly speaking, two types of situations in which questions of state action tend to be contested in § 1983 cases. The first such situation arises when the complained-of action was undertaken by an individual or entity that the parties agree was, as a formal matter, nongovernmental, but which had some kind of relationship with the government bringing the supposedly private nature of its actions into question—such as when a private contractor provides a public service. *See, e.g.*, *Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co., Inc.*, 780 F. App'x 197, 207 (6th Cir. 2019) (considering whether dental benefits contractor in state's Medicaid system engaged in state action). *Lindke*, however, presented the second type of situation, involving not the relationship between the government and a nominally private party, but the dueling public and private roles of a single person. The party that committed the challenged act in *Lindke* was not the wholly private actor involved in the furnishing of the page—that is, Facebook—but rather Freed himself, who was, at all relevant times, the holder of an official government office. Some of the tools that the courts have developed for considering the relationships between distinct governmental and nongovernmental actors—particularly the

14

"state-compulsion test"—are of no use in such a setting. *Id.* at 1203 (citing *Lugar*, 457 U.S. at 939).

The Sixth Circuit explained that situations like *Lindke* and this case call for a "different test," which the court called the "state-official test." *Id.* at 1202–03. The state-official test—which the Sixth Circuit characterized as a "a version of the Supreme Court's nexus test"—focuses on "the ultimate question [of] whether a defendant's action 'may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). In order to answer that question, the court must "analyze whether [the official's] action is 'entwined with governmental policies' or subject to the government's 'management or control.'" *Id.* (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)). In the context of social media, that means that the court should "look to a page or account as a whole, not each individual post" in order to determine whether the particular "social-media activity at issue" is "(1) is part of an officeholder's 'actual or apparent dut[ies]' or (2) [could not] happen in the same way 'without the authority of [the] office.'" *Id.* (quoting *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001)).

Unfortunately, both halves of that test become considerably trickier when the person at issue is simultaneously the holder of an office in the present and a candidate for the same office in the future. This case is a perfect example. Although the argument that took place in the comments section of Faison's Labor Day post was, at some points, hard to follow, it appears that some of the debate that occurred involved, at least implicitly, discussion of the minimum wage. One can ask: Are Faison's views on the minimum wage relevant to his role as a legislator today or to his role as a candidate for the same office in the next legislative term? The answer, of course, is "both"—and the same would be true of essentially any issue. As long as one assumes

15

that communicating with the public is part of a legislator's duties—which it seems clear that it is, at least in a broad sense—then there may be very little, if any, substantive way to tell the difference between an official statement and a campaign statement.

The same problem exists, albeit more subtly, with the question of whether events could, in the words of *Lindke*, "happen in the same way" if the person involved was not a public official. The events in this case almost certainly would not have happened in *exactly* the same way if Faison had not been an incumbent. His page would have looked slightly different, for one thing, and it seems plausible that fewer individuals might choose his page as the place to argue. Moreover, the substance of criticisms of Faison would be different—focused on the kind of legislator he might be, not what he had already done. The fact that an individual is a sitting government official with direct jurisdiction over an issue will unavoidably color the interactions he has about that issue. That does not, however, change the fact that the official has a First Amendment right to discuss such an issue in a non-official capacity, including in an effort to sway voters to return him to office.

*Lindke* lists a few factors that should guide the court's consideration of the state-official test: (1) whether any "state law, ordinance, or regulation compelled" the defendant official to maintain the page at issue; (2) whether maintaining the page is "designated by law as one of the actual or apparent duties of his office";[3] (3) whether "government funds" were used in the maintenance of the page; (4) whether "government employees" were used to maintain the page; and (5) whether the page "belong[ed] to the office"—that is, whether the page would pass hands

---

[3] These first two questions are closely related, but this court has listed them separately because, as a technical matter, a duty can be dedicated to an official by law without its being compulsory. For example, a chief executive may not be "compelled" to pardon or grant clemency to anyone, but, when he does, he is acting officially. In any event, it is of no import whether one considers these to be separate factors or different aspects of the same factor—as long as the court considers them both.

to the next officeholder or be retained by the defendant upon leaving office. Based on the evidence before the court, some of those factors clearly favor a finding that Faison's page was nongovernmental. There is no evidence that Faison ever used public funds on the page, and he denies that he has. There is no evidence that he had government staffers participate in the page's maintenance—and, in fact, there is affirmative evidence that he did not. Even assuming that the broad task of communicating with the public is an official duty of a legislator, operating a Facebook page—or any social media page—is neither compulsory nor expressly covered by any particular authorizing statute. Finally, the page is associated with Faison the public figure, not his office, and would remain his when he leaves office, rather than being passed to his successor. Those factors, together, suggest that the page is "more akin to a campaign newsletter than to anything else," *Campbell*, 986 F.3d at 827 —even if it would be a campaign newsletter with a comments section.

Fox nevertheless argues that several factors support finding state action under *Lindke*'s state-official test: the constituent service Faison has performed through the page; Faison's use of the page to discuss issues related to his office; the more far-reaching and public-facing nature of Faison's duties compared to those of a city manager;[4] the fact that government staffers had access to the page as administrators, even if they did not alter the page in any visible way; the fact that Faison had a separate profile for himself as an individual; and the fact that people other than Faison participated in the page's administration—which, Fox argues, undermines any assumption that it was a purely "personal" page. And Fox may be right that some combination of those factors, backed up by sufficient and persuasive evidence, could support a holding that the administration of the page amounted to state action. Nothing in *Lindke* suggests otherwise. In

---

[4] Fox may be somewhat underestimating the breadth of a city manager's powers. *See* Charter of the City of Port Huron, Mich. §§ 5-1 to -6 (setting forth powers of city manager), *available at* https://www.porthuron.org/government/city_council/city_charter.php.

order to establish a meaningful likelihood of success on the merits, however, Fox needs more than simply a workable theory. He needs evidence, and that is where he falls short.

At oral argument, counsel for Fox conceded that, despite the fact that *Lindke* expressly calls on the court to consider the relevant "page or account as a whole," the record itself includes no such thing. The evidence before the court is sparse and incomplete with regard to either the outward content of the page or the details of how Faison used the page behind the scenes. For example, while there is evidence that Faison used the page for constituent service from time to time, the court has no evidence of how frequently he did so. As a recognizable public figure, Faison might be confronted by an observant constituent's needs in any setting, and directing that constituent to the appropriate governmental resources available through Faison's office would not render the setting in which such an encounter occurred governmental. As the Sixth Circuit wrote in *Lindke*, "[w]hen [an official] visits the hardware store, chats with neighbors, or attends church services, he [is not] engaged in state action merely because [he is] 'communicating'— even if [he is] talking about his job." *Id.* at 1205. There is presumably a point at which a webpage is used for such purposes so frequently that the page becomes less like a hardware store and more like a district office. The court, however, has no evidence that Faison's page reached that point.

A similar lack of evidence prevents the court from placing much weight on the fact that members of Faison's legislative staff had access to the page. Fox has pointed out, correctly, that the fact that Faison's staffers did not directly post to the page does not mean that they did not use it for official business. Social media pages are, among other things, information-gathering tools, and there may well have been ways in which Faison's staffers used the page for official business without altering the page themselves. Again, though, the court has only speculation to go off of.

The court cannot assume that discovery would yield evidence sufficient to swing this factor from Faison's side of the argument to Fox's.

An analysis of whether and how the page was a public forum follows largely the same route to the same conclusion. The public forum analysis can be broken down into two essential questions: first, whether the forum at issue was government-controlled; and, second, if so, what kind of government-controlled forum it was. The disagreement in this case is, at this stage, confined almost entirely to the former of those two questions. While the parties disagree regarding whether Faison's Facebook page was a public forum, Faison has not advanced a meaningful argument against the conclusion that, if the forum was public, it was a designated public forum, in which viewpoint discrimination would have been impermissible. Rather, Faison relies on the principle that, "when a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment . . . ." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). The parties' disagreement on this issue therefore largely mirrors their disagreement regarding the state action doctrine, and Fox's likelihood of success is undermined by the same limitations of the record.

The court therefore concludes that, while Fox has demonstrated some possibility of success, that likelihood is less than what would typically support preliminary relief, at least in the absence of a very strong showing under the other governing factors. That does not mean, however, that Faison is entitled to dismissal of Fox's § 1983 claim on this ground. The approach mandated by *Lindke* is highly context-dependent and plainly leaves open the possibility that a Facebook page might, through the details of its actual use, come to function as a venue for engaging in state action. The court similarly sees no reason why a Facebook page could not become a public forum. Faison has conceded that there is no requirement that a public forum

19

actually be publicly owned, and the facts, as pleaded, establish that Faison did exercise a meaningful amount of control over the page, including the comment sections. Faison has pointed out that Facebook could have withdrawn that control, but, even if the court could assume that that is the case in the context of Rule 12(b)(6), Faison has not identified any caselaw suggesting that a public forum becomes nonpublic simply because the owner of the relevant "property"[5] has a technical—but unlikely to be used—right to divest control from the government.

Moreover, while the unverified allegations of Fox's Complaint have only limited weight in the context of his request for a preliminary injunction, the court is required to take those allegations as true and construe them in Fox's favor when considering the Motion to Dismiss. The Complaint contains a number of additional details regarding Faison's use of the page for activities that could be characterized as governmental in character. (Doc. No. 1 ¶¶ 20–34.) The relatively open-ended nature of the *Lindke* analysis leaves room for the possibility that such actions, taken together, amounted to the use of the page for governmental purposes. The court accordingly will not dismiss any claims on this ground.

---

[5] The court notes that the question of who "owns" Faison's page may be more complicated than either party has, so far, accounted for. Faison's Facebook page appears to have involved the combination of many types of rights, not all of which necessarily belonged to the same party. Certainly, the page was likely generated using computer code that Facebook owns or licenses under the principles of copyright law. That code alone, however, would only be sufficient to create a generic page, not Jeremy Faison's page. This particular page was made through a combination of Facebook's code with (1) additional copyrightable material provided by Faison and his consultants and (2) Faison's personal endorsement—that is, his personality and publicity rights—designating the page as his own. *See* Tenn. Code Ann. § 47-25-1103 (Tennessee Personal Rights Protection Act). Facebook and Faison, moreover, likely have a contractual relationship embodied in Facebook's terms of service, and that relationship almost certainly includes the allocation of various rights between them—including some rights to Faison. *See Facebook, Inc. v. Solonchenko*, No. 21-CV-08230-LB, 2022 WL 18491616, at *6 (N.D. Cal. Dec. 29, 2022) ("The parties had a contract because the defendant created a Facebook account, accessed Facebook's services, and agreed to the terms of service."). Finally, Facebook's information about the page is physically housed somewhere, on land that is owned by someone as real property, using hardware that is owned by someone as personal property. The relationships involved are, to put it mildly, more complex than a simple analogy to a landlord and tenant or host and guest would allow.

**B. Government Speech**

"The First Amendment's Free Speech Clause does not prevent the government from declining to express a view" on its own behalf. *Shurtleff v. City of Bos., Massachusetts*, 142 S. Ct. 1583, 1589 (2022) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–469 (2009)). Accordingly, the fact that an action is (1) speech-related, (2) involves excluding a disfavored viewpoint, and (3) can be attributed to the government does not necessarily mean that the action was unconstitutional. If the government was only expressing its own position, not hindering anyone's right to express his own, then no abridgement occurred and the First Amendment was not violated. Faison argues that, insofar as the court is unpersuaded by his arguments regarding state action and public forum, it should hold that Faison had no obligation to avoid viewpoint discrimination because the Facebook page was his own official government speech.

"The boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program." *Id.* at 1589. In such a situation, the court must conduct "a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* The Supreme Court has considered "several types of evidence to guide the analysis, including: the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209 (2015)).

Fox does not dispute that aspects of Faison's page—particularly, the posts themselves—may well have been government speech. Fox responds, however, that he is not arguing that the entire page was a forum, only that its interactive comment sections were. The comments, Fox notes, clearly distinguished between which statements were made on behalf of Faison and which

21

were made by others—to the point that Faison himself was actually able to debate his positions with individual commenters. Moreover, the basic concept of a "comment section" is, by now, well-established, and ordinary users likely understand that such a section represents an avenue for other users to share their reactions to a post, not an extension of the post itself.

Like the question of state action, the question of government speech may depend on a fuller picture of the Facebook page than is currently available to the court. The facts that Fox has pleaded, however, are sufficient to plausibly state that Faison's comment sections would not have been understood by any reasonable viewer to be his own official speech. This alternative rationale therefore provides no basis for dismissing the claims.

## C. Sovereign Immunity Regarding State-Law Claim

Faison argues next that, the aforementioned substantive issues aside, the court has no power to consider the Tennessee-law claim against him, because it is barred by the doctrine of sovereign immunity. In the American federal system, each state possesses certain immunities from suit that "flow[] from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005). Consequently, a state may not be sued for money damages by a private individual, subject to a few exceptions. *Id.* at 358–59; *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'") (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974)). Sovereign immunity extends not only to a state itself but to "arms of the state," such as certain state agencies. *Ernst*, 427 F.3d at 358 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Because "[a]n official capacity claim filed against a public

employee is equivalent to a lawsuit directed against the public entity which that agent represents," *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000), the claims against Faison are effectively claims against the Office of the Representative of the Eleventh District of the Tennessee House of Representatives and, by extension, the State of Tennessee itself.

Sovereign immunity is no obstacle to Fox's § 1983 claim, because he seeks only prospective relief and is therefore entitled to proceed pursuant to *Ex parte Young*, 209 U.S. 123 (1908). The courts have held, however, that, "because the purposes of *Ex parte Young* do not apply to a lawsuit designed to bring a State into compliance with state law, the States' constitutional immunity from suit prohibits *all* state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature." *Ernst*, 427 F.3d 351, 368 (6th Cir. 2005) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). Fox's claim pursuant to Tenn. Code Ann. § 1-3-121 therefore cannot proceed unless sovereign immunity was waived.

It is undisputed that Tenn. Code Ann. § 1-3-121 waives sovereign immunity with regard to suit in Tennessee state court. Faison argues, however, that the law does not waive sovereign immunity with regard to claims brought in federal court. Another judge of this district recently considered the same issue and reached the conclusion that Faison urges the court to reach here:

> "Waivers of immunity must be construed strictly in favor of the sovereign, . . . and not enlarge[d] . . . beyond what the language requires." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685 (1983) (internal quotation marks and citations omitted). Here, Tennessee's pronouncement of a cause of action for alleged constitutional violations does not specifically state that it is waiving its sovereign immunity to suit in federal court, as opposed to state court. *See Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) ("[A] State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation."). Further, the Sixth Circuit found many years ago that the Tennessee legislature, by virtue of Tenn. Code. Ann. § 20–13–102(a), has retained the sovereign immunity of the State of Tennessee for lawsuits brought against it in federal court. *See Berndt v. State*, 796 F.2d 879, 881 (6th Cir. 1986).

23

> Nothing in Tenn. Code Ann. § 1-3-121 suggests that it was intended to trump the State's general retention of sovereign immunity to suit in federal court provided by Tenn. Code Ann. § 1-3-121.Accordingly, the Court concludes that sovereign immunity prevents Plaintiffs from pursing its Tennessee constitutional claim in this Court.

*McLemore v. Gumucio*, No. 3:19-CV-00530, 2020 WL 7129023, at *23 (M.D. Tenn. Dec. 4, 2020) (Richardson, J.).

At oral argument, counsel for Fox conceded that Fox does not dispute Judge Richardson's analysis or conclusion regarding waiver of sovereign immunity. Indeed, even if no such express concession had been made, Fox's briefing includes no meaningful argument contesting waiver, so the point would have been effectively conceded regardless. If there was no waiver and *Ex parte Young* is inapplicable, however, there is no basis for denying Faison his sovereign immunity. The court accordingly will dismiss Fox's state-law claim.

**D. Legislative Immunity**

The Tennessee Constitution protects the "speech or debate" of the state's legislators from interference from the other branches of Tennessee government. *See* Tenn. Const. art. II, § 13. The U.S. Constitution provides similar protections to federal legislators. *See* U.S. Const. art. I, § 6. Although neither Constitution expressly protects a *Tennessee* legislator from *federal* interference, *see United States v. Gillock*, 445 U.S. 360, 374 (1980), the U.S. Supreme Court has held that state legislative immunity does exist against the federal government, at least to some degree, such that "state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). Fox does not dispute that principle or the fact that Faison would, in some situations, be entitled to such immunity; he argues only that Faison is entitled to no such immunity here. At issue, then, is

whether Faison was engaged in "legislative activities" when acting as administrator of the "State Representative Jeremy Faison" Facebook page.

Although it might seem odd that Faison is asserting legislative immunity in connection with an action that he insists had no connection to his office, "[w]hether an act is legislative depends on the nature of the act, rather than the official's motive or intent." *Guindon v. Twp. of Dundee, Mich.*, 488 F. App'x 27, 33 (6th Cir. 2012) (citing *Bogan*, 523 U.S. at 54). "The 'legislative sphere' reaches things 'generally done in a session of the [legislature] by one of its members in relation to the business before it.' That includes those matters 'integral' to legislators' 'deliberative and communicative processes' for evaluating bills, voting, or performing other tasks within their 'jurisdiction.'" *Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 365 (6th Cir. 2022) (quoting *Gravel v. United States*, 408 U.S. 606, 624 (1972); citing *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)). The Sixth Circuit has suggested that, in order to determine whether a particular action fell within the legislative sphere, a court should consider both "whether the acts were legislative in form" as well as whether they were "'legislative in substance,' i.e. whether they 'bore all the hallmarks of traditional legislation,' including 'a discretionary, policymaking decision.'" *Guindon*, 488 F. App'x at 33 (quoting *Bogan*, 523 U.S. at 55–56).

Faison argues that Fox's arguments regarding state action can—inconveniently for Fox—also double as arguments that Faison should be entitled to legislative immunity. After all, Faison's only official office is that of legislator; any official actions he took, accordingly, were official by virtue of his legislative office. Fox responds that Faison's administration of the page, though governmental, did not involve action within the "legislative sphere" because it was not

25

integral to any legislative process. Fox argues that Faison was, rather, acting in an "administrative or executive" capacity. *Anders v. Cuevas*, 984 F.3d 1166, 1181 (6th Cir. 2021).

Faison is correct that Fox appears to be setting a very narrow path for himself, but the court cannot conclude that that path is totally blocked. The principle that an officer's special immunities do not extend to administrative acts incident to his office is well-established, even if it comes up more frequently in connection with judicial defendants than with legislative ones. *See, e.g., Cooper v. Parrish*, 203 F.3d 937, 945 (6th Cir. 2000) (citing *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)). Faison argues that, even if such a distinction is important with regard to some officials—namely, those who actually have meaningful non-legislative duties—his role in Tennessee government is solely that of legislator. Such an argument, however, amounts to a claim that Tennessee legislators are entitled to absolute immunity for *every official act* they take. Faison, however, has not identified any caselaw endorsing such an absolutist position.

The parties will have ample opportunity to develop the record regarding the extent of Faison's responsibilities and how he used his various communication platforms in furtherance of those duties. For the time being, however, Fox has cleared the bar of plausibly alleging that the comment-based portion of the "State Representative Jeremy Faison" page—with its wide-ranging discussions of general issues, rather than solely discrete pieces of legislation—was more along the lines of a public gathering space overseen by Faison's office than an official avenue for providing discrete legislative feedback. The decisions about who could and could not access that public gathering space could fairly be characterized as administrative. The court, accordingly, will not dismiss Faison's § 1983 as barred by legislative immunity.

**E. Preliminary Injunction Factors**

Because Fox has established *some* likelihood of success—even if that likelihood is not particularly high—the court must move on to its consideration of the other preliminary injunction factors: irreparable harm, equities, and the public interest. These factors often favor the plaintiff in constitutional litigation, because the courts have long held that the violation of a person's constitutional rights is, in and of itself, irreparable, inequitable, and against the public interest, at least to some degree. *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004); *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That principle, though, has different implications in this case, because Fox is not the only individual whose First Amendment rights hang in the balance. Certainly, *if* Faison's page is, in fact, a government-controlled designated forum, then a preliminary injunction would prevent further violation of Fox's rights. If Fox is wrong about that, however, a preliminary injunction would do more than simply unnecessarily constrain an official—the risk that granting a preliminary injunction in a § 1983 case always runs. An unwarranted injunction would, rather, be a violation of Faison's own First Amendment rights—resulting in at least as much harm to Faison as Faison is alleged to have done to Fox. Indeed, the fact that Fox waited a year to even file this suit undermines any inference that Fox is suffering under practical hardship at all—other than the abstract harm that would be associated with the constitutional violation that he has, so far, not established to have occurred. Moreover, while Fox still has the option to post his messages anywhere else that is available, aside from this one page associated with one politician who does not even represent him, "State Representative Jeremy Faison" *is* Faison. This is, as far as the record shows, his only official Facebook page as a

public figure. His loss of control over that page would therefore be a substantially greater intrusion on his speech than Faison's blocking Fox has been of Fox's.

Although the information regarding Faison's page available to the court is incomplete, the court has seen enough to know that Faison uses the page to discuss issues of political importance. He sometimes does so, moreover, in the context of his campaigns for reelection. Political speech on controversial topics made with the purpose of impacting an election goes to the very core of what the First Amendment protects. *See Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1650 (2022). If Faison does, in fact, maintain his Facebook page in his capacity as a citizen and candidate, not as an official, then he has his own right not to have a government actor—in this case, the court—step in to take control of that page away from him, even partially. That is particularly true given that a preliminary injunction would amount to a requirement that Faison lend his own figurative microphone to opinions that he objects to—not least because they are often quite aggressively critical of him. *See Janus*, 138 S. Ct. at 2464.

It is possible that, when Faison makes decisions about what comments to allow on his Facebook page, he is acting in his official capacity. The caselaw permits such a holding—if the facts support it. That connection, though, has not actually been shown—or even shown to be particularly likely. What is certain, in contrast, is that an injunction of this court *would* be an exercise of government power against Faison, one that the court cannot take lightly, given the core speech interests involved. If the court misused that power against a private citizen—even one who also happens to hold an official office—it would amount to a serious constitutional injury. Whether the court grants an injunction or denies one, then, it will be rolling the dice with someone's First Amendment rights. One of these two parties will bear that risk, and it was Fox's

burden, as the movant, to establish that it should be Faison. Because he has not done so, the court will deny the request for a preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, Fox's Motion for Preliminary Injunction (Doc. No. 6) will be denied, and Faison's Motion to Dismiss (Doc. No. 17) will be granted in part and denied in part. Fox's claim pursuant to Tenn. Code Ann. § 1-3-121 will be dismissed, but his federal claim under § 1983 will remain pending.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge