# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DEAN FOX,       )
           )
  Plaintiff,      )
           )
v.           )  **Case No. 3:22-cv-00691**
           )  **Judge Aleta A. Trauger**
REPRESENTATIVE JEREMY FAISON, )
State Representative, representing the  )
11th District of the Tennessee House of )
Representatives, in his official capacity, )
           )
  Defendant.     )

## MEMORANDUM

Plaintiff Dean Fox sues State Representative Jeremy Faison, purportedly in his official capacity only, for deleting comments made by Fox and then blocking him entirely from accessing or leaving comments on Faison's Facebook "page." Fox alleges that Faison, in taking these actions, violated his rights under the First Amendment.[1] He seeks a "declaration that Defendants' [sic] policies and practices of blocking Mr. Fox" from Faison's Facebook page violate the First Amendment and an injunction ordering Faison to unblock Fox and to "refrain from blocking individuals based on viewpoint" from his official Facebook page. (Complaint, Doc. No. 1 at 21.)

Now before the court are the parties' cross-Motions for Summary Judgment (Doc. Nos. 61 (Faison), 64 (Fox)), each supported by a Memorandum of Law and Statement of Undisputed Facts, and the parts of the record that support their factual statements. Each party has responded to the other's motion, and both have filed Reply briefs in further support of their own motion.

---

[1] The court previously dismissed as barred by sovereign immunity Fox's state law claim for violating his rights under the Tennessee Constitution. (*See* Doc. Nos. 33, 34.)

For the reasons set forth herein, the court finds that defendant Faison is not authorized to speak on behalf of the state and, therefore, that the First Amendment claim against him fails under the first prong of the test announced by the Supreme Court in *Lindke v. Freed*, 601 U.S. 187 (2024). On that ground, the defendant's Motion for Summary Judgment will be granted, and the plaintiff's will be denied. The court does not reach the parties' other arguments.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)). By its terms, Rule 56 anticipates "that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Id.* at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "[T]here must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## II. FAISON'S MOTION

### A. Facts[2]

#### 1. *Faison's Use of Facebook*

Facebook is a privately owned social media platform that enables users to create accounts for the purpose of exchanging information and disseminating content through online "posts." Facebook generally allows users to create two types of accounts: "profiles" and "pages." A

---

[2] The facts set forth herein for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 67-1) and are undisputed for purposes of the defendant's Motion for Summary Judgment. Unless otherwise indicated, all facts are viewed in the light most favorable to Fox, as the non-moving party for purposes of Faison's motion.

"profile" typically consists of a picture, a banner image, and a "wall" where users can post pictures, videos, and other media. A "page," on the other hand, acts as a public-facing webpage where public figures, businesses, and organizations can promote themselves or provide information to those who have chosen to "follow"—*i.e.*, subscribe to—their page. Facebook maintains final authority over interactions between profiles and pages and has the discretion to allow content as it sees fit, even if the content departs from Facebook's general "community standards."

To facilitate content moderation, Facebook gives page administrators tools to hide or delete comments on posts, implement word restrictions, limit access by age or geography, and block accounts from the page altogether. If page administrators employ Facebook's blocking tool, the targeted account is prohibited from interacting with the page moving forward. Blocked accounts remain free to post on their own wall, on friends' walls, or virtually anywhere else on Facebook.

Defendant Faison is the Tennessee State Representative for Tennessee House District 11, a district that includes Cocke County and parts of Jefferson and Greene Counties.[3] Faison has served as the Republican Caucus Chairman since 2019. (Doc. No. 66-2, Faison Dep. 37.)[4] As Caucus Chairman, he chairs Caucus meetings, runs Caucus elections, assists the Speaker of the House and the Majority Leader, and establishes an "open forum" to "allow people to be able to share their thoughts about" proposed legislation or "issues in the caucus." (*Id.* at 285.) The Caucus has its own Facebook page, as well as Instagram, Twitter, and YouTube pages. (*See* Doc. No. 66-4, White Dep. 17.) Caucus Chairman is "an elected position inside an elected position," pursuant to which Faison "works for the 74 other members in the Tennessee House." (Faison Dep. 286.)

---

[3] Faison was first elected in 2010. (Doc. No. 12-1, Faison Decl. ¶ 2.)

[4] The depositions in the record are in compact form, with four pages to one standard page. For clarity, the court cites to the original deposition transcript pagination, rather than to the page numbers assigned by CM/ECF.

As Caucus Chairman, Faison teaches "Freshman orientation" classes to new members, effectively to "walk through what their roles are, what they can do, what they can't do," to "teach[] them the ropes." (Faison Dep. 251–52.) While he takes no position on whether Caucus members should or should not have a social media presence, he has "helped members with their social media," such as giving them "ideas of what to post." (*Id.* at 97–98, 268–69.) And as part of his class with new Caucus members, he tells them "to make sure they are dialoguing with their constituents," in whatever medium they choose. (*Id.* at 268.)

As Caucus Chairman, Faison hires Caucus staff members, who are state employees. (*Id.* at 229.) Nick Crawford was the Majority Caucus Advisor from September 2019 to December 2022. (Doc. No. 66-3, Crawford Dep. 19.) Anna Katherine White was the PR Specialist/Executive Assistant for Policy and Research from September 2021 to January 2023 and Senior Legislative Advisor from January 2023 until June 2023. (White Dep. 16, 51.) Grace Gilmore began serving as Executive Assistant for Policy and Research in June 2023. (Doc. No. 66-5, Gilmore Dep. 24.) The duties of these staff members are to conduct policy research, create talking points, track legislation, and attend meetings on behalf of Representative Faison, in his capacity as Caucus Chairman. It is undisputed that, in their positions, these individuals were engaged in creating content—highlighting legislative accomplishments, for example—for the Caucus social media pages, and this content was also made available to Caucus members to distribute to the public and to use on their own social media pages. (Faison Dep. 79–81, 100–02, 245; White Dep. 19, 22, 30.)

Faison created a Facebook profile in December 2008. In 2015, he created a Facebook page named "Jeremy Faison." Faison's page was "verified"—a process by which Facebook confirms the authenticity of a page or profile—in December 2019. After that verification, Faison changed

the page name to "State Representative Jeremy Faison," and Facebook merged Faison's profile friends list with his page followers.

Faison uses his page to post about his family and personal interests, personal opinions and campaign efforts, and legislative initiatives and efforts. According to Faison, he controls both his Facebook profile and his Facebook page through his Facebook account, and the log-in associated with his Facebook account is a private, @gmail.com email address. (Faison Decl. ¶ 11.) He is the only person, aside from "consultants that [he] hired with campaign funds, who has ever posted on [his] page." (*Id.* ¶ 13.) The state does not own or control Faison's page, and the page will remain his after he leaves office. (*Id.* ¶¶ 21, 23.) Faison is the only person who has ever deleted or hidden a post by a commenter or blocked another Facebook account from accessing his page. (*Id.* ¶ 13.) Although he granted Crawford and White administrative access to his page, neither of them has ever used that access or posted to Faison's account. ((*Id.* ¶ 19; White Dep. 121; Crawford Dep. 75.) Nick Crawford did help Faison set up an "auto response, because he didn't check his messages, saying, 'I don't check my messages.'" (Crawford Dep. 778.)

According to Faison, "[n]o state funds have ever directly or indirectly been used to create, maintain, manage, or administer [his] page." (Faison Decl. ¶ 22.) Fox purports to dispute Faison's statement that no state funds have been used directly or indirectly to maintain or administer Faison's Facebook page. He points to evidence in the record indicating that Faison consulted with members of his staff about what types of things he should and should not say on his Facebook posts. (Faison Dep. 39.) Faison's Legislative Assistant would look through comments on his Facebook page to find "questions to follow up with people." (*Id.* at 201–02.) White testified that she advised Faison to show his draft posts to other people before posting them, to get their opinions. (White Dep. 112–13.)

Faison's "Representative Jeremy Faison" page has approximately 13,000 followers. Clicking the "Send Email" link on the page opens an email to Faison's government email address. The page does not contain any "content policy" restrictions, such as express limitations on the discussion of certain subjects or issues. Faison uses the page to "engage with [his] constituents," though he does not typically "check the constituency" of individuals who comment on his page. (Faison Dep. 32, 141.) One of his goals is to "reach the maximum amount of people." (*Id.* at 57.) He uses his Facebook page to "share what [he's] thinking about politics and [his] opinions" and to "inform [his] constituents about legislation." (*Id.* at 32, 162; *see also* Doc. No. 66-2 at 130 (sharing information about the Tennessee Information Privacy Act, legislation proposed by other legislators).) He shares information about legislative meetings and legislation promoted by the Republican Caucus and passed by the Tennessee House of Representatives. (Faison Dep. 166–67.) He has used his Facebook page to discuss the process of drafting legislation and to poll and solicit ideas from his followers on legislation and policy matters. (Doc. No. 66-2 at 132, 137.)

Faison acknowledges using his Facebook page to address constituent needs and encourage constituents to seek assistance. (*See, e.g.*, Doc. No. 66-2 at 135 (a post by a follower reminding Faison that they "need trail hollow [road] repaired desperately," to which Faison responded, "I have certainly raised that need.").) Faison explained in his deposition that Trail Hollow Road was a county road washed out in a flood, and local residents were "incredibly frustrated that that road was not getting fixed." (Faison Dep. 200.) He acknowledged, "I don't have any authority from the State. I don't have the ability to call up TDOT and say, hey, can you help me here. . . . So I ended up calling one of my friends, who is a state representative from Jackson, Tennessee," who "showed up with a track hoe and cleared out a massive log jam at the bridge that Trail Hollow starts. And used the front scraper to basically push out a one-lane so people could get in and out." (*Id.* at 201.)

On another occasion, he posted on his Facebook page about "TEMA, Unemployment, SNAP, and TANF," stating, "my assistant from Nashville is here at my pest control office this morning. Please swing by with any questions." (Doc. No. 66-2 at 134.) He has also posted information about town hall meetings he hosts, and he posts about state-recognized holidays (such as Labor Day). (Faison Dep. 155, 175–79; Doc. No. 66-2 at 151.)

No evidence suggests that these posts constitute official announcements by the state, the House of Representatives, or the Republican Caucus; nor is Faison's Facebook page the sole (or first) place on which such information appears. Faison characterized his job as "work[ing] on . . . behalf of" the people who elected (or re-elected) him and "speak[ing] on their behalf." (*Id.* at 58.) The point of his social media is to let his "people know what [he's] speaking, where [he's] speaking, how [he's] speaking. (*Id.*)

As indicated above, Faison's Caucus staff created content specifically for the Tennessee House Republican Caucus to post on the Caucus's social media sites, with the intention that Caucus members could use or repost that material on their own social media platforms. (White Dep. 106–07; Crawford Dep. 105–06.) Grace Gilmore, who runs the House GOP Caucus's social media platforms, also testified that, if any members of the Caucus asked her for graphics, she provided them. And she specifically recalled that she had probably supplied Faison with fifty such graphics. (Gilmore Dep. 56–47.) Gilmore's deposition testimony strongly suggests that she considered supplying Caucus members any graphics they asked for—with the implication being that they would use these graphics on their own social media outreach—to be part of her job. (*See id.*) Faison denies asking staff members to create content specifically for him to use on his Facebook account during working hours while they were on state time. He specifically contends that he only asked his staff to help him create personal content, if at all, when they were off the clock. (*See* Faison

Dep. 245–46 (stating that, if he asked Gilmore to do something for him personally, it would be at night, not during work hours); Crawford Dep. 166 (noting that it was "best practices" for legislators not to have staff members create a personalized logo on state time).)

### 2. Fox's Use of Facebook

Plaintiff Fox resides in Tennessee, but he has never lived within Faison's district. He uses Facebook primarily as a platform to discuss his passion for sports and to share "dad jokes," but he also uses it to stay informed about legislative decisions in Tennessee, to engage in policy discussions, and to make his voice heard. (Doc. No. 66-6, Fox Dep. 9, 22, 29–30.) He began following Faison on Facebook after meeting him in the Cordell Hull State Office Building in 2019. (*Id.* at 14.) He has engaged with Faison through Faison's "State Representative Jeremy Faison Facebook" page under his personal profile, "Dean Fox."

Prior to being blocked, Fox occasionally commented on Faison's Facebook posts regarding policies and legislation Faison supports. (*See* Doc. No. 66-6 at 35.) Many of his posts on Faison's page were in response to other followers' comments. Some of his posts were arguably inflammatory and/or disrespectful toward Faison or his supporters.

On September 6, 2021, consultants hired by Faison posted "Happy Labor Day – the people of Tennessee deserve a holiday for always getting the job done!" along with a graphic also stating "Happy Labor Day" with Faison's logo on it. (Compl. ¶¶ 36, 38.) Fox stepped into a discussion between Faison and another commenter regarding this post, publishing the following comment to Faison:

> Dude, you're not in a position to judge anyone or anybody about anything. You haven't paid back your PPP [Paycheck Protection Program] loan, you routinely neglect the people of your district, you've helped exacerbate the pandemic, you've purposely lied about racial issues and you refuse any accountability for your actions.

Don't tell people to better themselves when you refuse to take your own advice. You are the politician the Founders warned us about: a selfish, power-hungry glad-hander whose only motivation is to keep dining at the trough.

(Doc. No. 12-13 at 2; *see also* Fox. Dep. 24–25.)

Shortly after it was posted, this comment was deleted or hidden from Faison's Labor Day Facebook post. (Fox Dep. 27; Faison Decl. ¶ 27.) Fox posted another comment asking why his prior comment had been deleted; this comment, too, was deleted. (Fox Dep. 28.) Immediately thereafter, Fox was blocked from viewing or engaging with Faison's Facebook page from his account. (*Id.* at 29–30; Faison Decl. ¶ 27.) It is undisputed that Fox can no longer use his blocked account to discuss policy with Faison or others on Faison's page.

**B.  Discussion**

Fox sues Faison under 42 U.S.C. § 1983 for violating his rights under the First Amendment. As noted above, he sues Faison in his official capacity only, as specifically denoted in the case caption and further indicated by the fact that Fox seeks injunctive relief rather than damages. Faison seeks summary judgment on the § 1983 claim, arguing that: (1) Faison's actions are not "fairly attributable to the state"; (2) if they were attributable to the state, then he would be entitled to legislative immunity; and (3) alternatively, if Faison's Facebook page constitutes government speech, then the First Amendment is inapplicable. (Doc. No. 63 at 11–12.)[5] Finding Fox's first argument to be meritorious and decisive, the court does not reach the defendant's other arguments or the plaintiff's Motion for Summary Judgment.

---

[5] The court employs the pagination assigned by CM/ECF to the parties' summary judgment briefs.

### 1. *Lindke v. Freed*

"Personal liability against a state official can be established under § 1983 by showing 'that the official, acting under color of state law, caused the deprivation of a federal right.'" *Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir. 2003) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Lindke v. Freed* ("*Lindke*"), 601 U.S. 187, 194 (2024) ("Section 1983 provides a cause of action against '[e]very person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State*' deprives someone of a federal constitutional or statutory right." (emphasis in original) (quoting 42 U.S.C. § 1983)). Thus, to cite a common example, a police officer who arrests someone without probable cause or using excessive force may be sued in his individual capacity for violating the arrestee's constitutional rights because he acted under color of law while misusing his authority. *Accord, e.g.*, *Lindke*, 601 U.S. at 200 ("While the state-action doctrine requires that the State have granted an official the type of authority that he used to violate rights—*e.g.*, the power to arrest—it encompasses cases where his 'particular action'—*e.g.*, an arrest made with excessive force—violated state or federal law." (quoting *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)).

On the other hand, "[w]hen an official is sued in his or her official capacity under § 1983, 'the [governmental] entity's policy or custom must have played a part in the violation of federal law.'" *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 563–64 (6th Cir. 2007) (emphasis added) (quoting *Graham*, 473 U.S. at 166). This is because "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Graham*, 473 U.S. at 165 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," because "the real party in interest is the entity." *Id.* at 166 (citations omitted). Thus, to prevail in

an official-capacity suit, the plaintiff must show that the "*governmental entity*" was the "moving force behind the deprivation" of constitutional rights, "such that the 'entity's policy or custom . . . played a part in the violation of federal law.'" *S.H.A.R.K.*, 499 F.3d at 563–64 (quoting *Graham*, 473 U.S. at 166). This requirements applies whether the entity is a municipality or a state. *Accord, e.g.*, *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State. Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation. Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law." (internal quotation marks and citations omitted)). At the same time, the Supreme Court has also clarified that state officials may be held liable in their personal capacity for actions taken in their official capacity. *Id.* at 27.

Applying these principles to First Amendment cases that arise when state officials create Facebook (or other social media) accounts and then delete unwelcome comments and block those who made them has proved challenging. In *Lindke v. Freed*, the Supreme Court purported to clarify the test for determining whether a state official engages in state action or acts as a private citizen in taking such actions. In that case, Lindke sued Freed, the City Manager for Port Huron, Michigan, in both his official capacity and his individual capacity, seeking declaratory and injunctive relief and monetary damages. *Lindke v. Freed* ("*Lindke I*"), 563 F. Supp. 3d 704, 707 (E.D. Mich. 2021), *aff'd*, 37 F.4th 1199 (6th Cir. 2022), *vacated and remanded*, 601 U.S. 187 (2024). Freed sought summary judgment on both claims, asserting that he was protected by qualified immunity, for purposes of the individual capacity claim and that the official-capacity claim was barred because Lindke could not show that "a policy or custom of the City of Port Huron was involved in

Defendant's decision to delete comments or block Plaintiff." Br. Supp. Def.'s M. Summ. J. at 7, *Lindke v. Freed*, No. 2:20-cv-10872-MAG-DRG (E.D. Mich. Feb. 17, 2021), Doc. No. 23. The district court granted summary judgment to Freed, finding that he had not engaged in state action when he deleted comments by Lindke on Freed's Facebook page or by blocking him from accessing his page. *Lindke I*, 563 F. Supp. 3d at 706. Because this conclusion was entirely dispositive, the court did not separately address the official-capacity claim or the parties' other arguments. The Sixth Circuit affirmed, applying a multi-factor "state-official test" to determine that Freed was not engaged in state action when he operated his Facebook page. *Lindke v. Freed* ("*Lindke II*"), 37 F.4th 1199, 1201 (6th Cir. 2022), *vacated and remanded*, 601 U.S. 187 (2024). Addressing the state-action issue, the court held that a "public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 1203 (citation omitted).

The Supreme Court granted review to reframe the applicable test for determining whether a government official's "posts about job-related topics on social media" constitute "official or private" speech. *Lindke*, 601 U.S. at 191. The Court articulated a deceptively simple test: "such speech is attributable to the State only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Id.*

The Court acknowledged that whether a state official engaged in state action or acted as a private citizen is a particularly difficult question in the speech context, because state officials "are also private citizens with their own constitutional rights." *Id.* at 196. So, "if Freed acted in his private capacity when he blocked Lindke and deleted his comments, he did not violate Lindke's First Amendment rights—instead, he exercised his own." *Id.* at 197. Distinguishing between

"private conduct and state action turns on substance" and, in the context of social media communications, "demands a fact-intensive inquiry." *Id.*

Citing precedent largely addressed at determining whether a private actor engaged in state action, the court emphasized that the first prong of its test—whether the official "possessed actual authority to speak on the State's behalf"—must be answered in the affirmative before a reviewing court reaches the second prong. *Id.* at 198, *see also id.* ("The appearance and function of the social-media activity are relevant at the second step, but they cannot make up for a lack of state authority at the first.").

Such power must come from one of the sources identified in § 1983: "statute, ordinance, regulation, custom, or usage." *Id.* at 200 (quoting § 1983). While written laws are self-explanatory, the Court explained that the terms "custom" and "usage" "encompass 'persistent practices of state officials' that are 'so permanent and well settled' that they carry 'the force of law.'" *Id.* at 200 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). Thus, as applied to the facts before it, "a city manager like Freed would be authorized to speak for the city if written law like an ordinance empowered him to make official announcements" *and* if, for example, "prior city managers have purported to speak on [the city's] behalf and have been recognized to have that authority for so long that the manager's power to do so has become 'permanent and well settled.'" *Id.* And if he has such "authority to speak for the State, he may have the authority to do so on social media even if the law does not make that explicit." *Id.* "In sum, a defendant . . . must have actual authority rooted in written law or longstanding custom to speak for the State. That authority must extend to speech of the sort that caused the alleged rights deprivation." *Id.* at 201.

Only if the plaintiff "make[s] this threshold showing" would a court be required to consider whether the official also "purport[ed] to use" that authority. *Id.* "'[G]enerally, a public employee'

purports to speak on behalf of the State while speaking 'in his official capacity or' when he uses his speech to fulfill 'his responsibilities pursuant to state law.'" *Id.* (quoting *West v. Adkins*, 487 U.S. 42, 50 (1988)). "If the public employee does not use his speech in furtherance of his official responsibilities, he is speaking in his own voice." *Id.*

The Court recognized some markers that might help identify whether an official purports to exercise his official authority when he speaks through social media. For instance, courts should consider whether the account carried a label or a disclaimer announcing that it was a personal page or, conversely, whether the account belonged to a political subdivision. If neither, indicating a "mixed use" account, then a close analysis of the "content and function" of individual posts would be required to determine whether the official, in making the post, was "purporting to discharge an official duty." *Id.* at 203.

Finally, the Court also distinguished between the two different actions to which the plaintiff objected: the deletion of specific comments and the blocking of his account from viewing Freed's Facebook page. The Court noted that, with respect to the claims arising from the deletions, "the only relevant posts are those from which Lindke's comments were removed." *Id.* at 204. For blocking, however, "[b]ecause blocking operated on a page-wide basis, a court would have to consider whether [the defendant] had engaged in state action with respect to any post on which [the plaintiff] wished to comment." *Id.*[6]

---

[6] On remand, the Sixth Circuit concluded that remand to the district court was required and that the plaintiff should be permitted to conduct additional discovery tailored to the newly articulated standard. *Lindke v. Freed*, 114 F.4th 812, 820 (6th Cir. 2024). The court also noted that, "even if discovery uncovers that some of Freed's posts were state action, a host of other First Amendment issues remain," including "what kind of forum Freed's social-media accounts are, what level of scrutiny his deletion or block decisions receive, and whether he's entitled to qualified immunity." *Id.* at 821. The district court's docket in *Lindke* reflects, however, that effectively no action has been taken following remand.

Few courts have had the opportunity to apply *Lindke*'s state action test. Even fewer have applied it to actions taken by local, state, or federal *legislators*, as opposed to executive-branch officials. In one case, the district court held, first, that the plaintiff failed to show that the defendant, a U.S. Congressman, acted under color of *state* law in deleting the plaintiff's comments and blocking him from his Twitter accounts, as opposed to acting in his "official capacity as a United States Congressman." *Dixon v. Clyburn*, No. 9:23-CV-04500-SAL-MHC, 2024 WL 5379014, at *5 (D.S.C. Oct. 10, 2024), *R&R adopted*, No. 9:23-CV-04500-SAL-MHC, 2025 WL 354416 (D.S.C. Jan. 31, 2025). The court also held that the complaint "lack[ed] sufficient factual allegations to show that [the congressman] exercised actual authority to speak on behalf of the Legislature when he spoke via his Twitter accounts." *Id.* at *6. The North Dakota Supreme Court has similarly held, based on *Lindke*, that a state senator who used Facebook to communicate with her constituents did not engage in state action when she blocked the plaintiff from accessing her Facebook page and that the senator had "no authority to act on behalf of the State in the administration of her Facebook page." *Sanderson v. Myrdal*, 13 N.W.3d 739, 747 (N.D. 2024), *cert. denied*, 145 S. Ct. 1939 (2025).

Relatedly, the Eastern District of Tennessee has held that a plaintiff's allegations that an elected juvenile court judge who regularly posted on social media about the "conduct of juvenile court proceedings, public events, and policies of the Juvenile Court" were not sufficient to show that the judge engaged in state action, absent evidence that he was "'possessed of state authority to post' on these topics pursuant to his duties." *Chase v. Morgan*, No. 1:24-CV-265, 2025 WL 918438, at *5 (E.D. Tenn. Mar. 26, 2025) (quoting *Lindke*, 601 U.S. at 199) (some internal quotation marks omitted).

Finally, at least one district court has held, pre-*Lindke*, that a member of the U.S. Congress "has almost no power to act on behalf of" the government. *Buentello v. Boebert*, 545 F. Supp. 3d 912, 918 (D. Colo. 2021). The court recognized that an individual representative's powers, though "important," are "few" and generally do not include acting on behalf of the government. *Id.*; *see also id.* at 918–19 ("[U]ltimately Congress as a whole is in control of the ship of state. But its individual members, unlike executive branch officials, generally do not have authority to act on behalf of the state.").

2.     *Faison Lacks Authority to Speak on behalf of the State*

Faison first contends, based on *Lindke*, that Fox cannot show that he "'possessed actual authority to speak on the [government's] behalf' through his Facebook page." (Doc. No. 63 at 7 (quoting *Lindke*, 601 U.S. at 191).) He maintains that a Tennessee legislator's "state-created powers are to propose legislation and to vote—and little else." (Doc. No. 68 at 9 (quoting *Buentello*, 545 F. Supp. 3d at 919).) Faison, as set forth above, testified that a legislator's authority is limited to the ability to "enact laws, set state spending, make and authorize tax policy, vote on vetoes, and appropriate moneys." (*Id.* at 14–15 (citing Faison Dep. 152–53).) He acknowledges that he also has some limited administrative authority to hire and fire staffers and to implement personnel policies. He maintains that none of these authorities "entail[s] the use of Facebook to speak for the State." (*Id.*)

The plaintiff argues that Faison "possesses actual authority to speak for the State on social media through both written law and entrenched legislative custom that establish social media as a standard tool through which legislators perform their official duties." (Doc. No. 67 at 7.) He argues that Faison's argument to the contrary "relies on an overly narrow reading of *Lindke* and overlooks substantial evidence of a 'custom or usage' amongst Tennessee legislators to use Facebook as a tool to carry out their official duties." (*Id.*)

Fox's response and the *Lindke* test both beg the question: how literally must the court read *Lindke*? *Lindke* states repeatedly that, for a state official to engage speech that is attributable to the state, the official must have "actual authority to speak on the State's behalf" or "on behalf of the State." *Lindke*, 601 U.S. at 191; *see also id.* at 198, 199, 200, 201, 204. The Court framed the first prong of its test in *Lindke* as asking whether "a city manager like Freed would be authorized to speak for the city," either because a city ordinance "empowered him to make official announcements" or because "prior city managers have purported to speak on [the city's] behalf and have been recognized to have that authority for so long that the manager's power to do so has become 'permanent and well settled.'" *Lindke*, 601 U.S. at 200. And at least one commentator has observed that "Justice Barrett's opinion for the Court signaled that the test should be understood narrowly," insofar as the opinion emphasized that it is "not enough that 'making official announcements *could* fit within the job description [of the public official].'" Evelyn Douek & Genevieve Lakier, Comment, *Lochner.com?*, 138 Harv. L. Rev. 100, 150 (2024) (alteration in original) (quoting *Lindke*, 601 U.S. at 201). Rather, "making official announcements" must "*actually* [be] part of the job." *Id.* (quoting *Lindke*, 601 U.S. at 201).

The court concludes that it must take *Lindke* literally. Thus, the determinative question is whether a Tennessee legislator has actual authority to make official announcements on behalf of the state or engage in any other speech on behalf of the state. The answer is no. As Fox himself acknowledges, the Tennessee Constitution "vests legislative authority in the General Assembly and mandates that legislators fulfill their duties in accordance with the Oath of Office." (Doc. No. 67 at 7 (citing Tenn. Const. art. II, §§ 3, 24, 28).) Article II, Section 3 of the Tennessee Constitution states in relevant part that the "Legislative authority of this State shall be vested in a General Assembly," with members of the House of Representatives holding office for two years "from the

day of the general election." Tenn. Const. art. II, § 3. Article II, Section 24 pertains to the General Assembly's obligation to approve expenditures and expenditures and to balance the state budget, and Section 28 authorizes the General Assembly to impose taxes and to provide tax relief to elderly, low-income, and disabled residents. None of these powers authorizes an individual legislator to make official announcements on behalf of the state.

In addition, state legislators taking office sign an Oath of Office, swearing to "faithfully support the Constitution of this State and the United States"; to "vote without favor, affection partiality, or prejudice"; and *not* to "propose or assent to any bill, vote or resolution, which shall appear to me injurious to the people, or consent to any act or thing, whatever, that shall have a tendency to lessen or abridge their rights and privileges, as declared by the Constitution of this state." (Doc. No. 66-2 at 141.) Thus, it is undisputed that Faison, as a state legislator, is charged with the official duties of authoring, debating, sponsoring, and voting on legislation that affects Tennessee residents and upholding the Tennessee Constitution. (*See* Faison Dep. 152–54, 193, 265.) All of these are actions taken collectively rather than individually.

Faison acknowledged that engaging with his constituents is "important." (*Id.* at 266.) That is, as he teaches new legislators,

> [i]f you care about your job, the only way you can do your job effectively is communicating and dialoguing with the people who sent you here, number one.
>
> Number two, if you're not in contact with them, you're going to have an election in two years. If you've done a good job, hopefully you've given them a reason to vote for you again. If you've not and you've not dialogued with them, most voters will find someone who will dialogue with them.

(*Id.* at 266–67.) However, nothing in the record indicates that Faison's posts on Facebook or his communications to constituents through any other medium constitute speech "on the State's behalf," *Lindke* 601 U.S. at 191, 198—regardless of whether his engagement with constituents is part of his job as an elected representative.

In other words, unlike a city manager or, perhaps, a legislative body functioning as a unit, an individual state legislator *never* has the authority to speak on *behalf* of the state, even when he is engaged in his official duties of proposing and voting for or against proposed legislation, because legislators "can *take action* only collectively." Bernard Bell, Notice & Comment, *Linke v. Freed: Weighing in on Public Official's Social Media Sites*, Yale J. on Regul. (Apr. 22, 2024), https://www.yalejreg.com/nc/linke-v-freed-weighing-in-on-public-officials-social-media-sites/ [https://perma.cc/5X6C-VANH];[7] *accord Buentello*, 545 F. Supp. 3d at 918 ( "[I]ndividual members [of a legislative body], unlike executive branch officials, generally do not have authority to act on behalf of the state."); *see also* Tenn. Const. art. 2, § 11 (requiring a quorum of "[n]ot less than two-thirds of all the members . . . to do business").

While the plaintiff points to some evidence that state legislators commonly engage and speak with their constituents through various media, including social media, he points to no evidence that a Tennessee state legislator, in performing those functions, is authorized by written law or longstanding custom to speak *for the state* or to make official pronouncements—as opposed

---

[7] As acknowledged in the same article, legislators engage in other activities, aside from voting for legislation, that do not require collective action, such as "assisting constituents in redressing their grievances with respect to administrative agencies' decision[s]" and "us[ing] their official position to influence private entities." Bell, *supra*, at 20. Even in such situations, however, legislators, although arguably acting in their official capacity, are not authorized to *speak on behalf of the state*. Instead, they typically act as a conduit between the state and their constituents. If they speak on behalf of anyone in these situations, they are speaking on behalf of their constituents. (*Accord* Faison Dep. 58 ("I want my people to know that I'm doing their work on their behalf. 70,000 people asked me to speak for them in Nashville at the State Capitol, on their behalf.").) Even when voting, indisputably one of their official duties, individual legislators do not speak on behalf of the *state* but on behalf of the citizens they represent. (*Accord id.* at 280 ("I have a duty to vote on behalf of my constituents.").) A legislator's duty to act on behalf of his constituents may give rise to an obligation to communicate with constituents to ascertain what they want him to do, but this duty does not entail authority to speak *for the state*.

to simply functioning as a conduit between the state and the constituents whose interests a legislator is supposed to represent.

To be sure, in addressing the second prong of its state action test, the Supreme Court explained that a state employee "purports to speak on behalf of the State while speaking in his official capacity or when he uses his speech to fulfill his responsibilities pursuant to state law." *Lindke*, 601 U.S. at 201 (internal quotation marks omitted). And a legislator may well purport to act in his official capacity when he engages in such activities as posting or conducting town hall meetings, polling his constituents on issues, informing his constituents through his Facebook page about legislative achievements, and so forth. But the court does not reach the second question— whether an official acted in his official capacity or in furtherance of his job duties—unless it has answered the first question in the affirmative.

As the Supreme Court explained in *Lindke*, the distinction between public and private speech, "in the context of a public official using social media," rides on the question of whether the official "possessed actual authority to speak on the State's behalf," such that the "conduct allegedly causing the deprivation of a federal right [can] be *fairly attributable to the State*." *Id.* at 197, 198 (quoting *Lugar*, 457 U.S. at 937) (emphasis added in *Lindke*). "By contrast, when the challenged conduct 'entail[s] functions and obligations in no way dependent on state authority,' state action does not exist." *Id.* at 198–99 (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 318–19 (1981)). Faison's engagement with his constituents via Facebook or otherwise is not dependent on state authority.

In *Lindke*, the Court faulted the plaintiff for focusing on the appearance of Freed's Facebook page—it "look[ed] and function[ed] like an outlet for city updates and citizen concerns." *Id.* at 199. The Court held that this focus "skip[ped over th[e] crucial step" of determining whether

Freed had *actual* authority conferred by the state to "post city updates and register citizen concerns." *Id.* Similarly, Fox skips a step when he argues that state legislators' use of social media to communicate with their constituents is such a "deeply embedded 'persistent practice . . . so permanent and well settled' that it is a customary part of the job carrying 'the force of law.'" (Doc. No. 67 at 8 (quoting *Lindke*, 601 U.S. at 200).) He points out that nearly 95% of legislators maintain Facebook pages identifying their official roles and promoting civic engagement. Further, Faison, as Republican Caucus Chair,[8] hosted training sessions for new members of the Caucus, emphasizing to them the importance of using social media to engage with their constituents and even going so far as to invite a Facebook representative to train the Caucus on optimizing social media for public communication. Fox argues that these facts establish an "institutional endorsement of Facebook as a medium through which Tennessee legislators speak and fulfill their duties." (*Id.* (record citations omitted). Again, however, while it is clearly acceptable—perhaps even customary—for legislators to communicate with their constitutes through the use of social media, legislators, in engaging in such communications, do not speak on behalf of the state.

*Lindke* may not be the final word on the intersection of public officials, social media, and the First Amendment. The opinion does not acknowledge critical distinctions between executive branch officials and legislative branch officials. At the same time, the Court did not suggest that the *Lindke* test applied only to executive branch officials or that a different test would apply to legislators. Taking *Lindke* at its word, for a state official to engage in state action for purposes of First Amendment analysis, at least when social media is concerned, the threshold question is whether the state official has "actual authority to speak on behalf of the State on a particular

---

[8] In his capacity as the Republican Caucus Chair, Faison may on some occasions speak on behalf of the Caucus, but Fox does not—and could not—argue that speaking for the *Caucus* equates to speaking on behalf of the *state*.

matter"—not whether the state official customarily engages in speech on a particular matter as part of his job description. A Tennessee state legislator arguably acts in furtherance of his official duties when he engages with his constituents, whether through a town hall meeting or on his Facebook page, but he is not in any sense authorized to speak "on behalf of the state" when he engages in that activity.

In sum, because Fox cannot satisfy the first prong of the *Lindke* test by showing that Faison is authorized, as a state representative, to speak on behalf of the state, he cannot show that Faison engaged in state action either by posting on Facebook or by deleting Fox's comments and then blocking him entirely from accessing Faison's Facebook page. Faison, therefore, is entitled to summary judgment.

## III.  CONCLUSION

For the reasons set forth herein, Faison's Motion for Summary Judgment (Doc. No. 61) will be granted, and Fox's Motion for Summary Judgment (Doc. No. 64) will be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge